FILED

**United States District Court**
**Northern District of Alabama**
**Southern Division**

02 JUL -9  AM 9: 46

U.S. DISTRICT COURT
N.D. OF ALABAMA

John T. Burks, et al.,      ]
                     ]
       Plaintiff(s),     ]
                     ]
     vs.              ]     CV-99-N-1085-S
                     ]
American Cast Iron Pipe Company,  ]
                     ]
       Defendant(s).   ]
                     ]



ENTERED

JUL 09 2002

**Memorandum of Opinion**

### I.    Introduction

The court has for consideration a motion for summary judgment by defendant American Cast Iron Pipe Company (hereinafter "ACIPCO"), filed May 1, 2002. (Doc. # 41). ACIPCO contends that judgment is due as a matter of law on the remaining two claims, as set forth in Counts Five and Six of the second amended complaint. (Doc. # 28). The plaintiffs, proceeding individually and on behalf of a putative class of now retired ACIPCO employees or their surviving dependents, concede that summary judgment is due in the defendant's favor as to Count Five. (Doc. # 47, p. 28 n.3). As for Count Six – a breach of fiduciary duty claim brought under the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA", 29 U.S.C. §§ 1001, *et seq.*) – the plaintiffs maintain that ACIPCO has breached the fiduciary duty it owes to the plaintiffs in this action, and that ACIPCO has failed to offer sufficient evidence that would warrant the entry of summary judgment. The issues have been briefed by the parties and the court finds the matter ripe for decision. On due consideration, the court finds the motion due to be and hereby granted.

53

## II.    Background

The facts underlying this action have twice been recited by other courts: once by this court (Doc. # 10, Guin, J.), and once by a *per curiam* panel of the Eleventh Circuit. *See Burks v. American Cast Iron Pipe Co.*, 212 F.3d 1333, 1334 (11th Cir. 2000). Since then, certain changes have rendered many of the facts superfluous for purposes of the present motion. Most importantly, the plaintiffs have conceded that the defendant is entitled to summary judgment on Count Five. Suffice it is to say that the above-styled action was commenced by former ACIPCO employees and their dependants claiming that ACIPCO overcharged them (almost 900 percent in one instance) for prescription medication sold in the company's pharmacy.  Although ACIPCO formed a committee in response to the retirees' complaints about pricing, the plaintiffs claim that its response was inadequate. They seek both monetary relief in the form of refunds for the overpayments made on prescriptions, and injunctive relief in the form of a structural modification of the applicable ERISA plan, to ensure that the ACIPCO pharmacy charges competitive prices.

The pricing of prescriptions at the ACIPCO pharmacy is at the heart of this dispute. Although the means by which prescription drug prices are set at the ACIPCO pharmacy have undergone certain changes in recent years, head pharmacist Becky Galletly[1] has been and remains responsible for setting these prices.  The current means by which she sets prices entail a consideration of the wholesale acquisition cost of the drug and the average

---

[1]The following is of note with respect to Ms. Galletly as head pharmacist: (1) her income is in no way based upon the amount of money ACIPCO loses annually in running the Pharmacy; (2) she is not evaluated based upon the cost of running the Pharmacy; and (3) she receives no benefit whatsoever from higher prescription drug prices at the Pharmacy.

wholesale price (a nationwide figure) of the drug, an inquiry into prices set by other local pharmacies, and a balancing of these figures so that ACIPCO's prices are competitive with local pharmacies.  The wholesale acquisition cost is the price ACIPCO pays to acquire a given drug.  ACIPCO pays 75 percent of the acquisition cost.  If the acquisition cost to ACIPCO is below what pharmacies in the surrounding area are charging, the prescription drug price is often marked up before resale to patients at the clinic.  Additionally, if a competitor's price is less than the average wholesale price, Ms. Galletly sets the ACIPCO price not at the competitor price but at the higher average wholesale price.  Finally, ACIPCO charges a dispensing fee in conjunction with the price charged for the prescription.  That fee was until February 1, 2002, $4.50 above the price of the drug.  On February 1, Ms. Galletly reduced the fee to $2.50.

The genesis of this litigation involves plaintiff-retiree Jerry Sumerel.  Mr. Sumerel was taking the drug Feldene, the generic name of which is Piroxicam.  Mr. Sumerel purchased the prescription from the ACIPCO Pharmacy at a cost of $169.16 for 100 capsules at 20 milligrams (of which he paid 25%).  At some point thereafter, Mr. Sumerel discovered that the same drug was available at a Wal-Mart store in the same quantity and dosage for a total price of $18.98.  Further investigation by himself and other retirees revealed that a number of other prescription drugs sold at the ACIPCO pharmacy were available elsewhere at lower costs.

Mr. Sumerel went to the director of the ACIPCO pharmacy Ms. Galletly and inquired about the discrepancy.  She apparently informed him that $169.16 was the correct price, and that the difference between ACIPCO's price and Wal-Mart's price was likely a result of Wal-

3

Mart having the drug on sale as a "loss leader"–apparently a means by which the Brobdingnagian retailer draws more customers into its stores. Nevertheless, she informed Mr. Sumerel that if he was not satisfied he could see Clinic Administrator Roland Bradford. Mr. Sumerel did so, and was assured by Mr. Bradford that he was charged the right price.

Dissatisfied with the responses of Ms. Galletly and Mr. Bradford, Mr. Sumerel and seven other retirees, plus two Board of Operatives Members, went to see Van Richey, the ACIPCO chief executive officer. They discussed the price of Piroxicam and other drug prices that they thought were out of line. Mr. Sumerel informed Mr. Richey that he was dissatisfied with the response of Mr. Bradford and that the pharmacies with which he had checked in the Birmingham area all sold this drug at approximately the same price, and concluded by suggesting that he thought ACIPCO was gouging prices on retirees and widows. Although the parties are in disagreement as to what Mr. Richey promised and what happened next, soon after this meeting ACIPCO management formed a pharmacy committee to study the pricing of prescription drugs. Mr. Sumerel was made a member of the Committee.

Part of the work initially performed by the Committee was to compare prices of the top 100 selling prescription drugs at the ACIPCO Pharmacy with the American Association of Retired Persons and with those of area competitors. The ultimate result of this work, in which all of the Committee members participated, was that the combined average retail price of all contacted pharmacies for all 100 of these drugs was $279.94 higher than the combined ACIPCO price for the same 100 drugs. This was reported at the April 11, 1996 meeting of the Committee. The Committee later performed a similar comparison for the

4

top 600 drugs sold at the ACIPCO Pharmacy. After the report was substantially complete, the Committee issued a progress report on August 14, 1996, signed by all Committee members, including Mr. Sumerel, that stated "the average price of prescriptions in the ACIPCO Pharmacy for the 400 surveyed is approximately the same or slightly less than the average price quoted by outside pharmacies for like quantity and quality."

In conjunction with the efforts made by the Committee, Ms. Galletly began checking with competitors, on a more systematic and thorough basis than before, to compare their prices on various prescription drugs to the ACIPCO Pharmacy prices. She discovered that some of the competitor's prices were higher and some were lower than the ACIPCO Pharmacy prices. She also found that Piroxicam could be purchased at a price of only $19.00, or 2 cents more per prescription than what Sumerel could buy it for at Wal-Mart. Ultimately, she decided to reduce drug prices by an extra 10 percent across the board. The plaintiffs note that the Committee rendered its findings as to price consistency after Ms. Galletly implemented her reductions.

Other relevant facts (some of which are in dispute) include the following: (1) neither Mr. Sumerel nor any of the other people who allegedly overpaid for their prescriptions were reimbursed; (2) ACIPCO made no attempt to ascertain whether in prior years anyone had overpaid for prescription drugs, or whether other drug prices were out of line with ACIPCO's goal to price competitively; (3) Mr. Sumerel was never told of any administrative procedure that he needed to follow or pursue in order to recover for his overpayment; (4) Mr. Sumerel continues to find prescription drugs in the local community at prices lower than those charged by the ACIPCO pharmacy; nonetheless, Ms. Galletly refuses to adjust

prices accordingly; (5) ACIPCO employees and retirees have never been told that ACIPCO reduced drug prices as a result of Mr. Sumerel's complaint about Piroxicam; moreover, employees and retirees never received the data and reports before the Committee; nor were they informed of changes implemented in the pricing of prescriptions at the pharmacy; (6) none of the plaintiffs (including Mr. Sumerel) made any effort to exhaust administrative remedies pursuant to plan policy.[2]

### III.   Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also DeJulio v. Georgia*, 276 F.3d 1244, 1248 (11th Cir. 2001). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

---

[2]That policy provides:

CLAIM PROCEDURES

The Company will provide the applicable claim forms whenever it is necessary for a participant to file a claim. If a claim for benefits under the Plan is wholly or partially denied, the Company will notify the claimant in writing of the denial of the claim, explain why the claim was denied and provide a description of any additional information required in order to honor the claim. In addition, the Company will give a reasonable opportunity to any claimant whose claim for benefits has been denied for a review of the decision denying the claim.

(Doc # 44, vol. 1, Ex. 2, p. 002986). Thus, when an employee or retiree wishes to file a claim, he or she may request the appropriate form from ACIPCO (or otherwise notify ACIPCO of the existence of a claim); submit the claim; and if the claim is denied, then the employee or retiree has the opportunity to have a review of the decision denying the claim.

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotations omitted); *see also Comer v. City of Palm Bay*, 265 F.3d 1186, 1192 (11th Cir. 2001); *Crawford-El v. Britton*, 523 U.S. 574, 600 n.22 (1998). The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Once the moving party has met this burden, "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)); *see also Comer, supra*.

The court must grant a motion for summary judgment if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249 (citations omitted); *accord Dzikowski v. NASD Regulation, Inc. (In re Scanlon)*, 239 F.3d 1195, 1198 (11th Cir. 2001); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). In rendering its decision, "[a] court 'must draw all reasonable inferences

7

in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Hinson v. Clinch County Bd. of Educ.*, 231 F.3d 821, 826-27 (11th Cir. 2000) (quoting *Reeves*, 530 U.S. at 150); *see also Comer*, *supra*.

## IV.   Discussion

The defendant raises three separate grounds which it believes supports an award of summary judgment on the plaintiffs' breach of fiduciary duty claim. First, the defendant maintains that neither ACIPCO nor its head pharmacist Ms. Gallely owed a fiduciary duty to the plaintiffs in setting the prices of prescription drugs at the ACIPCO pharmacy. Second, the defendant contends that even if the court were to find that ACIPCO or Ms. Gallely owed a fiduciary duty to the plaintiffs, the evidence fails to establish a breach of such a duty by either. According to the defendant, the evidence shows that ACIPCO and Ms. Gallely acted in the best interests of the plan participants and beneficiaries, and did not engage in any wrongful conduct to the detriment of the plan as a whole. Finally, the defendant contends that the plaintiffs have failed to exhaust their administrative remedies, thus barring as a matter of law the claims they now pursue.

Before addressing these arguments, the court pauses to address a threshold procedural issue.

## A.   Putative Class Action

As noted *supra*, the plaintiffs style this action as a putative class action. The plaintiffs have not, however, made any effort to certify the class pursuant to Rule 23 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 23(c)(1) ("As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order

whether it is to be so maintained."). On August 15, 2001, this court established the dispositive motion deadline for this action as March 1, 2002. (Doc. # 27). On January 31, 2002, the plaintiffs filed a motion to extend that deadline by sixty (60) days. (Doc. # 38). This court granted that motion on February 7, 2002. (Doc. # 40). On May 1, 2002, this court received defendant's motion for summary judgment. (Doc. # 41). On May 22, 2002, this court received a motion from the plaintiffs to file a response out of time. (Doc. # 45). In that motion, the plaintiffs stated the following: "Plaintiffs are represented by a small firm with only three attorneys, the most recent addition of whom has not worked on this case at all." (*Id.*, p. 1).

Although plaintiffs' failure to move or petition for class certification prior to the expiration of the dispositive motion deadline is a sufficient ground upon which the court may rely to deem the class allegations in the second amended complaint abandoned, the court further concludes that the limited resources of plaintiffs' counsel will hinder the ability of plaintiffs to fairly and adequately represent the interests of the class. *See* Fed. R. Civ. P. 24(a). Moreover, the plaintiffs have not suggested or attempted, insofar as the record shows, that more adequate resources may be available to them. The class allegations in the second amended complaint are, therefore, due to be **STRICKEN**.

### B.    ACIPCO and Ms. Gallety as Fiduciaries

Notwithstanding the defendant's arguments to the contrary, the evidence readily demonstrates that Ms. Gallety is a fiduciary by virtue of her duties and responsibilities in setting the prices for prescription drugs in the ACIPCO pharmacy. A person is a fiduciary with respect to an ERISA plan to the extent

9

(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). "Congress intended the term to be broadly construed. The definition includes persons who have authority and responsibility with respect to the matter in question, regardless of their formal title." *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987). Congress also recognized a link between the exercise of discretion and fiduciary responsibility. *See Useden v. Acker*, 947 F.2d 1563, 1574 (11th Cir. 1991) ("ERISA contemplates that fiduciary responsibility will be reposed automatically in a party that assumes a discretionary role."). "An entity need not have absolute discretion with respect to a benefit plan in order to be considered a fiduciary; rather, fiduciary status exists with respect to any activity enumerated in the statute over which the entity exercises discretion or control." *Blatt*, 812 F.2d at 812. "Thus whether or not an individual or entity is an ERISA fiduciary must be determined by focusing on the function performed, rather than on the title held. *Id.*; *see also Chapman v. Klemick*, 3 F.3d 1508, 1510 (11th Cir. 1993).

This functional approach to the determination of fiduciary status does ascribe some limits as to who may be designated a fiduciary to ERISA plan participants and beneficiaries. "[S]omeone who performs purely 'ministerial' functions for a benefit plan is not a fiduciary." *Blatt*, 812 F.2d at 812 (citing as examples of ministerial function the "application of rules determining eligibility for participation, calculation of services and benefits, and collection of contributions."). Moreover, "[a]n entity which assumes discretionary authority or control

10

over plan assets will not be considered a fiduciary if that discretion is sufficiently limited by a pre-existing framework of policies, practices and procedures." *Useden*, 947 F.2d at 1575; *see also Chapman*, 3 F.3d at 1510.

The defendant contends that Ms. Galletly, as ACIPCO's head pharmacist, owed no fiduciary duty to the plaintiffs because her duties in setting prices for prescription drugs were ministerial in nature and sufficiently limited by a pre-existing framework of policies, practices and procedures. The specific argument proceeds as follows:

> The evidence in this case is undisputed that ACIPCO has a longstanding policy and practice of setting the prices of prescription drugs at the ACIPCO Pharmacy that are competitive, on average, with the prices of prescription drugs at local pharmacies in the Birmingham, Alabama area. ACIPCO's Head Pharmacist sets the prices of prescription drugs at the ACIPCO Pharmacy based on this practice and policy. Ms. Galletly, on behalf of ACIPCO, does not, therefore, manager or administer "plan assets." She is simply a person who performs ministerial, administrative and investigatory tasks "within a framework of policies, interpretations, rules, practices and procedures made by others." As such, she "is not a fiduciary" under ERISA.

(Doc. # 43, p. 25). (citations omitted). The problem the court sees in this argument is that it is not borne out by the actual deposition testimony of Ms. Galletly.

In her deposition, Ms. Galletly offered testimony as to certain aspects of the pharmacy pricing system that corroborated the defendant's argument. For example, Ms. Galletly stated that her goal in pricing prescription drugs was "to set the price at a competitive price on an average with the surrounding pharmacies in the Birmingham area." Doc. # 44, vol. 3, Ex. E, p. 32. But Ms. Galletly also offered a great deal of testimony that revealed the actual scope of the authority, control and discretion she exercises over pricing

as head pharmacist.  The most notable testimony concerned the pricing scheme she implemented following the initial complaints about high prescription drug prices.

Q:  Mrs. Galletly, the pricing system that you described for me this morning before the lunch break, who came up with that pricing system?

  . . . .

A:  In what period of time?

Q:  Well, I'm not sure I understood there to be any different pricing system used at different times, was there?

A:  Prior to the discrepancy that occurred –

Q:  Meaning Mr. Sumerel's piroxicam?

A:  That's correct.  The pricing was done–the price updates were done electronically through MediSpan.

Q:  I'm talking about the system whereby you determine the price by looking at the average wholesale price, the acquisition cost and then looking at some comparative pricing in order to determine what a final price would be?

A:  Repeat the question.

Q:  Who determined that that was the method that would be used?

A:  I did.  I determined that.

Q:  And did you have to have that pricing method approved by anyone or could you just implement it yourself?

A:  The pricing method was to determine – was to bring our pricing in line with the average of competitor pricing, and I determined that.

Q:  I understand that.  My question was: Did you have the authority to just decide that yourself that this is how we're going to do pricing for the

> pharmacy, or did you have to get someone to approve that pricing method?

A:    To the best of my recollection, I implemented the system.

Q:    I understand you implemented. I'm asking did you have to get anyone to approve it, or did you have the authority to devise the pricing method yourself?

A:    I had the authority to do that.

*Id.*, pp. 96-98.

This is not the only indication of the extent of Ms. Galletly's authority, control and discretion as head pharmacist. Ms. Galletly testified that on one occasion when ACIPCO switched prescription drug suppliers, she made the decision to change on her own initiative.    Moreover, she made this decision unfettered by any obvious policies, interpretations, rules, practices or procedures. *Id.* pp. 51-55, 60-61. Additionally, Ms. Galletly conducted transactions with her suppliers on a very cordial and informal basis.

A:    . . . . They're saying if you buy your drugs from me, this is a formula we will use.

Q:    What's the formula?

A:    I do not know.

. . . .

Q:    Tell me what the formula is.

A:    I cannot tell you that off the top of my head.

Q:    Is there a single document, a contract, that ACIPCO signed with Bergen Brunswick when this agreement was made?

A:    To my knowledge, there is not a signed contract.

13

Q:   Is there a document that at least reduces the formula to writing so you
     would know what it is?

A:   It was verbally conveyed to me.  I do not know that there is a written
     document that exists.

Q:   If there was no written document and no contract and it was verbally
     conveyed to you but you don't recall what the formula is now, how do
     you know that they're complying with the formula and charging you
     what they're supposed to charge?

A:   It's because I believe that they are.   Because they have been
     trustworthy.

Q:   So you just trust them to charge you according to the formula that's not
     in writing anywhere?

A:   I believe that they will conduct their business in a manner that goes
     along with what they have told me.

*Id.*, pp. 56-57. Finally, Ms. Galletly made the decision to implement an across-the-board,

ten-percent reduction on prices of prescription drugs after it came to her attention that the

pharmacy's drug prices were not priced consistently with the average price of outside

competitors. *Id.*, pp. 62-69.

Suffice it is to say that ACIPCO has failed to provide sufficient evidence that Ms.

Galletly performs only ministerial, administrative and investigatory tasks within a framework

of policies, interpretations, rules, practices and procedures made by others. Ms. Galletly's

deposition testimony clearly reveals that she is operating as head pharmacist within a

framework of policies, interpretations, rules, practices and procedures largely put in place

by her. Within the context of ERISA, Ms. Galletly is a fiduciary vis-a-vis plan participants

and beneficiaries by virtue of her duties and responsibilities in setting the prices for

prescription drugs in the ACIPCO pharmacy.

14

## C.   Did Ms. Galletly Breach her Fiduciary Duties?

Plaintiffs' claim that the defendant breached its fiduciary duty in its pricing of prescription drugs essentially reduces to allegations of wrongdoing in the pricing of the drugs, in the maintenance of a dispensing fee added to the price of the drugs, and in the response taken by the defendant in the face of allegations that the prices of the drugs were not competitive in the local market. As noted *supra*, the defendant believes this claim is due to fail because the evidence fails to show that Ms. Galletly acted with something other than the best interests of the plan participants and beneficiaries in mind, or engaged in wrongful conduct to the detriment of the plan as a whole.

The court pauses here to briefly review the applicable standards and burdens guiding its analysis. First, it is clear that the plaintiffs bear the burden of proving a breach of a fiduciary duty. *See McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995); *see also Salovaara v. Eckert*, 222 F.3d 19, 26 (2d Cir. 2000). Thus, while the defendant bears the initial responsibility on summary judgment of informing the court of the basis for its motion, and identifying that which it believes demonstrates the absence of a genuine issue of material fact, the plaintiffs must, upon such a showing, go beyond the pleadings and show that there is a genuine issue for trial. Having reviewed the arguments and submissions of the parties, the court finds the plaintiffs have failed in this respect.

As a fiduciary, Ms. Galletly is "governed by ERISA's strict fiduciary rules . . . [which] impose[] high standards of fiduciary duty upon those responsible for administering an ERISA plan and investing and disposing of its assets. Indeed, the standard of care owed by ERISA fiduciaries, including trustees, has been described as the highest known to law."

15

*Herman v. NationsBank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997) (citations and

quotations omitted).  These rules provide, *inter alia*, that

> a fiduciary shall discharge his duties with respect to a plan solely in the
> interest of the participants and beneficiaries . . . for the exclusive purpose of
> . . . providing benefits to participants and their beneficiaries . . . with the care,
> skill, prudence, and diligence under the circumstances then prevailing that
> a prudent man acting in a like capacity and familiar with such matters would
> use in the conduct of an enterprise of a like character and with like aims.

*Hamilton v. Allen-Bradley Co.*, 244 F.3d 819, 825 (11th Cir. 2001) (quoting 29 U.S.C. § 1104

(a)(1)(A) & (B) (alteration in original)).  "As this section suggests, the duties of an ERISA

fiduciary are not limited by that statute's express provisions but instead include duties

derived from common law trust principles." *Eddy v. Colonial Life Ins. Co.*, 919 F.2d 747, 750

(D.C. 1990); *see also Varity Corp. v. Howe*, 516 U.S. 489, 496-97, 502-03 (1996); *Central*

*States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559,

570 (1985); *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) ("Prudence is measured

according to the objective 'prudent person' standard developed in the common law of

trusts."); *Reich v. Autrey*, No. 94-515-CIV-J-20, 1996 U.S. Dist. LEXIS 21487, at *16-*17 (M.D.

Fla. 1996).  These duties and a fiduciary's compliance with them are judged according to

the standards of others acting in a like capacity and familiar with such matters.   *See*

*Katsaros*, 744 F.2d at 279.  Lack of familiarity is no excuse.  *See id.*  Indeed, the court must

simply look at the actions of the fiduciary at the time the fiduciary engaged in them to

ascertain compliance.  *See id.*  In the event that matters are in dispute, ultimate resolution

of the issue is left to the trier of fact.  *See Jordan v. Federal Express Corp.*, 116 F.3d 1005,

1017 (3d Cir. 1997); *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994) ;

16

*Warzecha v. Nutmeg Cos.,* 48 F. Supp. 2d 151, 165 (D. Conn. 1999); *see also Herman v. NationsBank Trust Co.,* 126 F.3d 1354, 1369 (11th Cir. 1997).

The material matters here, however, are not in dispute. The plaintiffs have submitted no evidence tending to establish–or even suggest–that others acting in a capacity similar to that of Ms. Galletly would have acted differently under the facts of the instant case. Similarly, the plaintiffs have submitted no evidence tending to establish or suggest that Ms. Galletly took incorrect or inappropriate factors into consideration when she rendered decisions regarding the pricing of prescription drugs; when she subsequently reviewed and modified the prices of those drugs; and when she refused to provide reimbursements to plan participants and beneficiaries overcharged in their purchase of prescription drugs. Indeed, this final point is especially of interest, in light of the fact that Ms. Galletly–in the discharge of her duties as an ERISA fiduciary–must take into account both the provision of benefits to participants and their beneficiaries and the need to defray reasonable expenses of administering the plan. *See* 29 U.S.C. § 1104(a)(1)(A)(i) & (ii). The plaintiffs have offered nothing to show or suggest how Ms. Galletly might have implemented a reasonable refund system that could simultaneously give the plaintiffs what they want while keeping the expenses of the plan at a reasonable level. In fact, the only evidence plaintiff has offered in support of their claims are conclusory quibbles, quarrels and questions as to the actions taken by Ms. Galletly, rising largely from Mr. Sumerel's affidavit. This evidence is insufficient as a matter of law to create an issue of fact with respect to Ms. Galletly's discharge of her fiduciary duties to the plaintiffs.

Furthermore, Ms. Galletly did not breach her fiduciary duty to the plaintiffs by failing to disclose the amount of the dispensing fee being charged along with the price of the prescription drug. It is true that a "fiduciary must give complete and accurate information in response to participants' questions." *Hamilton v. Allen-Bradley Co.*, 244 F.3d 819, 827 (11th Cir. 2001). The question appears open as to whether the fiduciary must also provide such material information on her own initiative, or only upon a plan participant's or beneficiary's request. *See Varity*, 516 U.S. at 506; *but see Hamilton*, 244 F.3d at 827; *Eddy*, 919 F.2d at 750-51 ("At the request of a beneficiary (and in some circumstances upon his own initiative), a fiduciary must convey complete and correct material information to a beneficiary."). Resolution of this question is not necessary, however, because the plaintiffs have failed to come forward with any evidence suggesting that Ms. Galletly breached any duty she might have had insofar as the dispensing fee is concerned.

The evidence in no way establishes or even suggests that Ms. Galletly refused to disclose the existence or amount of the dispensing fee in the face of inquiries from plan participants and beneficiaries. Instead, the evidence shows that Ms. Galletly did not disclose the existence of the dispensing fee (prior to the events precipitating this litigation) because she believed standard practice in the pharmaceutical industry did not require such a disclosure.

> A: . . . [Y]ou're asking me has ACIPCO ever informed the employees, retirees, pensioners that they charge a dispensing fee?
>
> Q: Yes, ma'am.
>
> A: I don't know who would know that.

Q:    You think that would be a good thing to tell employees, retirees and their dependents?

. . . .

A:    With the dispensing fee being an industry standard, it is very much a part of the way all pharmacists handle medication prescription filling.

. . . .

Q:    And so don't you think the owners of the company should know that every time they get a prescription filled, they're paying an additional charge to cover the overhead of the pharmacy department?

. . . .

A:    When the company provides 75 percent of the cost of the prescription–when they pick that up–when they do not charge that to the patient, we're talking about $1.13.  Because it's an industry standard, I do not see the need.  If anyone had asked, we would have shared that.

Doc. # 44, vol. 3, Ex. E, pp. 24-25.  The plaintiffs do not dispute this fact (Doc. # 47, ¶ 25);

and have come forward with no evidence showing or suggesting either that Ms. Galletly

was mistaken in her understanding of industry practice or misapplied industry practice.[3]

In the absence of any such evidence, the court declines to conclude that the dispensing fee

---

[3]The only evidence presented to the court from which a contrary conclusion might be drawn is the affidavit of Lee Ann Wasden.  (Doc. # 48, Ex. 8).  In her affidavit, Ms. Wasden stated that one local pharmacy – a Bruno's Pharmacy in Hoover, Alabama – informed her that it does not charge a dispensing fee.  The plaintiffs also claim that Ms. Wasden's affidavit proves that ""[o]ther pharmacies breakout (sic) the dispensing fee separately from the price of the drug."  For the following reasons, the court is not persuaded.

First, the pharmacy who claims not to charge a dispensing fee was the only pharmacy of four surveyed who admitted to this fact.  The other three admitted to charging fees of varying amounts and in varying circumstances. Second, another Bruno's Pharmacy – also in Hoover, Alabama and one of the four surveyed – does charge a dispensing fee.  Third, Ms. Wasden admitted that "[a] number of pharmacists refused to speak with me, or refused to answer my questions about dispensing fees."  *Id.*  Finally, as for the claim that other pharmacies separate the dispensing fee and actual drug costs, the affidavit simply fails to corroborate this assertion.

assessed by the ACIPCO pharmacy constitutes a per se violation of Ms. Galletly's fiduciary

duties to plan participants and beneficiaries.[4]

## V.    Conclusion

The court will enter an appropriate order in conformity with this memorandum of

opinion.

---

[4]The court also notes here that the exhaustion doctrine likewise proves fatal to plaintiffs' claims. The evidence is undisputed that the plaintiffs failed to exhaust their administrative remedies prior to filing this federal action. The court is unimpressed with the argument plaintiffs offer in defense of their failure.

> Our law is well-settled that plaintiffs in ERISA actions must exhaust available administrative remedies before suing in federal court. However, a district court has the sound discretion to excuse the exhaustion requirement when resort to administrative remedies would be futile or the remedy inadequate, or where a claimant is denied meaningful access to the administrative review scheme in place.

*Perrino v. Southern Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1315 (11th Cir. 2000) (citations and quotations omitted). A decision "to apply or not apply the exhaustion of administrative remedies requirement for ERISA claims is a highly discretionary decision . . . but as a general rule plaintiffs in ERISA actions must exhaust available administrative remedies before suing in federal court." *Id.* This rule represents a "strictly enforce[d] exhaustion requirement on plaintiffs bringing ERISA claims in federal court with certain caveats reserved for exceptional circumstances [noted *supra*]." *Id.* at 1315-16. These exceptional circumstances do not include mere technical non-compliance with ERISA regulations. "Our exceptions to this doctrine . . . simply recognize that there are situations where an ERISA claim cannot be redressed effectively through an administrative scheme." *Id.* at 1318.

Consistent with this legal backdrop, the plaintiffs argue that their prayer for a court-imposed change in the structure of the plan is the type of redress that cannot be obtained through this administrative scheme. The court disagrees. Most notably, the facts of this case indicate otherwise. It is true that the plaintiffs did not receive refunds or related relief, but the plaintiffs by their efforts did ultimately effect several across-the-board cuts in prescription drug prices.

Moreover, the plaintiffs are seeking redress other than a structural change in the plan, redress of the sort necessitating exhaustion. *Cf. Mason v. Continental Group, Inc.*, 763 F.2d 1219, 1227 (11th Cir. 1985); *see also Springer v. Wal-Mart Assocs. Group Health Plan*, 908 F.2d 897, 900 (11th Cir. 1990). Were the court to excuse exhaustion simply because the plaintiffs have paired a prayer for monetary redress with a prayer for injunctive redress, the court would in the blink of an eye transform a rule of strict enforcement into one of limited applicability. Finally, Ms. Galletly's failure to personally inform Mr. Sumerel of the existence of administrative channels is no excuse. The plan clearly sets forth the administrative requirements necessary for claim review. Doc. # 44, vol. 1, Ex. 2, p. 002986. Furthermore, the court questions the significance and relevancy of Mr. Sumerel's encounters with Ms. Galletly. A host of plaintiffs in addition to Mr. Sumerel initiated this action against the defendant. Few–if any–actually spoke with Ms. Galletly, and most importantly, none–including Mr. Sumerel–inquired into administrative channels.

Given the relevant law and policy considerations set forth *supra*, as well as the lack of merit in the remaining arguments as to notice and futility, the court is inclined to believe that the plaintiffs have failed to exhaust their administrative remedies and are thus barred from prosecuting this action in federal court.

Done, this ___8 th___ of July, 2002.

Edwin Nelson
United States District Judge

21